**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THOMAS FITZGIBBONS,**

                                        **Plaintiff,**

            **vs.**                                         **3:21-CV-1019**
                                                            **(MAD/ML)**

**COUNTY OF TOMPKINS, TOMPKINS COUNTY**
**DEPARTMENT OF SOCIAL SERVICES, KIT**
**KEPHART, in her official and individual capacity as**
**Commissioner of Tompkins Department of Social**
**Services, DOUG PERINE, in his official and individual**
**capacity as Senior Fraud Investigator,**

                                        **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**GLASS HARLOW & HOGROGIAN LLP**              **BRYAN GLASS, ESQ.**
85 Broad Street - 17th Floor, WeWork
New York, New York 10004
Attorneys for Plaintiff

**ROEMER WALLENS GOLD &**                     **BENJAMIN D. HEFFLEY, ESQ.**
**MINEAUX LLP**                               **EARL T. REDDING, ESQ.**
13 Columbia Circle
Albany, New York 12203
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Thomas Fitzgibbons ("Plaintiff") commenced this action on September 15, 2021,

asserting various federal and state civil rights and employment-related claims against Defendants

County of Tompkins ("County" or "Tompkins County"), Tompkins County Department of Social

Services ("DSS"), Kit Kephart ("Defendant Kephart"), and Doug Perine ("Defendant Perine")

(collectively "Defendants"). *See* Dkt. No. 1.          Presently before the Court is Defendants'

motion for summary judgment. *See* Dkt. No. 25. Plaintiff opposes the motion and Defendants have replied. *See* Dkt. Nos. 30-31. For the reasons set forth below, Defendants' motion is granted.

## II. BACKGROUND

Plaintiff is a 62-year-old former security guard who worked for Tompkins County's DSS agency from July 2014 to December 2021. *See* Dkt. No. 28 at ¶¶ 8, 72. Plaintiff worked in the lobby of the County's Human Services Building in Ithaca, New York, which houses multiple agencies, including DSS. *See id.* at ¶ 9. Plaintiff's job responsibilities included screening and checking-in visitors, and generally keeping the peace. *See id.* at ¶ 10. Early in his employment, Plaintiff worked in the lobby area from 8:00 AM to 4:30 PM. *See* ¶ 19. Several years into his employment, Plaintiff chose the earlier 7:30 AM to 3:00 PM shift after his co-workers turned the option down. *See id.* at ¶ 20.

In 2017, Defendant Perine began serving as Plaintiff's immediate supervisor. Dkt. No. 28 at ¶ 12. As DSS Director of Operations, Defendant Perine also supervised general building security and maintenance. *See id.* at ¶ 13. Defendant Perine's immediate supervisor is DSS Deputy Commissioner Deana Bodnar ("Ms. Bodnar"). *See id.* at ¶ 16. Defendant Kephart is the DSS Commissioner and oversees Ms. Bodnar, Defendant Perine, and Plaintiff. *See id.* at ¶ 17.

Continuously throughout his employment, Plaintiff raised multiple workplace safety issues. *See* Dkt. No. 28 at ¶ 74. Plaintiff would often put comments in his incident reports regarding the County's perceived inaction in addressing workplace violence at the DSS building. *See id.* For example, Plaintiff would provide details of a particular incident, often involving hostile patrons in or near the lobby, followed by comments such as "[e]veryone's safety is in jeopardy" or "this is an ongoing problem that needs to be addressed before someone is assaulted

2

or killed." Dkt. No. 30-16.

In December 2018, Plaintiff took nine days of approved medical leave in connection with a back surgery. *See* Dkt. No. 28 at ¶ 21. Following his return, on January 15, 2019, Defendant Perine and Ms. Bodnar counseled Plaintiff regarding alleged incidents that occurred on January 4, 2019, and January 9, 2019. *See* Dkt. No. 28 at ¶ 22. Plaintiff received a written counseling memorandum regarding the two incidents. *See* Dkt. No. 25-12 at ¶ 31; Dkt. No. 25-15.

As to the first incident, the County alleged that Plaintiff verbally escalated a situation with an individual in the lobby. Dkt. No. 28 at ¶ 78. Plaintiff disputed the accuracy of the allegations, and contended that he did not speak while he was in the lobby. *See id.* As to the second incident, the County alleged that Plaintiff screamed at an individual in the lobby, and that the individual later filed a police complaint against Plaintiff. *See id.* Plaintiff disputed the allegations, and contended that it was the patron who was screaming. *See id.* Nonetheless, Plaintiff was directed to attend training in Syracuse. *See id.* at ¶ 24.

Notably, Plaintiff worked with two other security officers: Jennifer Vichedomini and Tyler Mix. Dkt. No. 28 at ¶¶ 43-44. Both co-workers are "significantly younger" than Plaintiff, and are "in their 30s or early 40s." *Id.* at ¶ 73. Defendant Perine did not issue a counseling memo to any other security officers on January 15, 2019. *See id.* at ¶ 79. Likewise, the younger security officers were not required to attend the training. *See id.* at ¶ 80.

Months later, on July 24, 2019, Plaintiff attended a meeting with Defendant Perine and Ms. Bodnar. *See* Dkt. No. 28 at ¶ 27. During the meeting, Plaintiff raised concerns about workplace safety. *See id.* Plaintiff also raised allegations that Defendant Perine had made sexually inappropriate comments about co-workers. *See id.* at ¶¶ 28, 81. Specifically, Plaintiff complained that at some point within the months preceding the meeting, Defendant Perine "yelled

3

across the lobby 'mama, where did you get those legs?' to a female probation officer, Gladys Carrion, which made her feel uncomfortable[.]"  *Id.*  Plaintiff complained that Defendant Perine also "referred to the security officers as chin nuts (a/k/a cock suckers)."  *Id.*

On August 12, 2019, Plaintiff filed a grievance through his collective bargaining representative, Civil Service Employees Association, Local 855 ("CSEA").  *See* Dkt. No. 28 at ¶ 30.  Plaintiff alleged that the County had failed to provide a safe working environment.  *See id.*  Following the initial grievance, Plaintiff met with Defendant Kephart, Ms. Bodnar, and County employees Lisa Holmes and Laura Granger.  *See* Dkt. No. 28 at ¶ 31.  Also in attendance was CSEA representative Stephanie Engster.  *See id.*

At some point, Defendant Kephart sought funding from the County Legislature to expedite a previously-planned third-party assessment of the DSS building security.  *See* Dkt. No. 28 at ¶ 32.  The County engaged third-party contractor BPS to conduct the assessment.  *See id.* at ¶ 33.  After several months, BPS evaluated the DSS building security's "strengths and weaknesses."  *Id.*  BPS circulated draft findings for management's review and ultimately issued a report with recommendations.  *See id.*  BPS conducted the assessment in early to mid-November 2019.  *See id.*  During a meeting on January 15, 2020, Ms. Bodnar informed the security officers that the assessment had been completed.  *See id.*

In or around March 2020, following the outbreak of the COVID-19 pandemic, security officers became responsible for COVID-19 visitor screenings. *See* Dkt. No. 28 at ¶ 11.  Around this time, Plaintiff requested leave pursuant to the Family and Medical Leave Act ("FMLA") to care for his elderly mother.  *See id.* at ¶ 34.  Initially, Defendant Perine "refused to sign off on the FMLA form."  *Id.* ¶ 35.  Ultimately, however, the FMLA leave was approved "[w]ithin three hours."  *Id.*  Defendant Perine threw the form on Plaintiff's desk and said "I didn't approve this."

*Id.*

From late-March to mid-May 2020, Plaintiff was out on FMLA leave for eight weeks.  *See* Dkt. No. 28 at ¶ 35.  At some point, Plaintiff called Defendant Kephart regarding his intended return to work.  *See id.* at ¶ 37.  Defendant Kephart suggested that Plaintiff not come back and be furloughed instead.  *See id.*  Plaintiff perceived that his supervisors did not want him back.  *See id.*  Plaintiff declined to be furloughed.  *See id.* at ¶ 38.

On or about May 17, 2020, Plaintiff returned from FMLA leave.  *See* Dkt. No. 28 at ¶ 39.  Plaintiff discovered that his shift was going to change from 7:30 AM to 3:00 PM to 8:30 AM to 4:30 PM.  *See id.*  Plaintiff learned about the shift change from a "Lobby Restructuring Memo" that Defendant Perine left on Plaintiff's keyboard.  *Id.* at ¶ 40.  Plaintiff did not receive a 14-calendar-day notice of shift change, as set forth in his CBA.  *See id.* at ¶ 41.  Rather, Plaintiff received only 10-days of notice.  *See id.*  Although the actual number of hours Plaintiff stayed on site did not change, when Plaintiff worked the earlier 7:30 AM to 3:00 PM shift, he could often leave early.  *See id.* at ¶ 42.  This change also effectively prevented Plaintiff from working for his friend in the afternoons, causing a loss of about $300 per week.  *See id.* at ¶ 42.  Defendant Perine was responsible for the decision.  *See id.* at ¶ 41.

According to the Lobby Restructuring Memo, security coverage would begin at 8:00 AM as opposed to the previous 7:30 AM starting time.  *See* Dkt. No. 25-13 at 1.  Plaintiff's co-worker Mr. Mix was scheduled to open the building and work 8:00 AM to 5:00 PM.  *See id.*; Dkt. No. 28 at ¶ 44.  Mr. Mix received additional hours because he requested them, and because he had taken on additional clerical work.  *See* Dkt. No. 28 at ¶ 44.  The later 8:30 AM to 4:30 PM shift would be staffed by Plaintiff and Ms. Vichedomini.  *See id.* at ¶ 43.

On June 9, 2020, the County issued Plaintiff a response denying his August 12, 2019

grievance regarding workplace violence. *See* Dkt. No. 28 at ¶¶ 32, 46. The grievance response was untimely relative to the deadline set forth in the CBA. *See id.* at ¶ 32; Dkt. No. 30-4. However, the response noted that "[s]ince September 2019 a number of new safety measures have been implemented at the HSB building screening at the front door. . . . A security assessment was conducted at the end of 2019 and preliminary results were shared with security staff as well as Department Heads[.]" Dkt. No. 30-4. The response also indicated that the assessment results "are being finalized in consultation with County Administration and will be shared with the Legislature for further action." *Id.* The same day he received the denial, Plaintiff filed a grievance challenging his shift change, and alleging that it was in retaliation for complaining about "workplace violence." Dkt. No. 28 at ¶ 47; Dkt. No. 30-18.

On July 21, 2020, Plaintiff filed a charge with the New York State Public Employment Relations Board ("PERB"). *See* Dkt. No. 28 at ¶ 49; Dkt. No. 30-9. Plaintiff alleged that the County retaliated against him for filing grievances by placing him in "more safety compromised positions at work" and changing his hours. Dkt. No. 28 at ¶ 49. Specifically, Plaintiff stated "on the basis that [his] employer was not complying with the New York state workplace violence law by failing to file multiple reports [he] filed about violent incidents in [his] workplace with the County risk assessor and County Department of Human Resources." *Id.* Plaintiff also filed a PERB charge against CSEA, alleging that the union "refused to push [the grievance] forward despite multiple requests[.]" *Id.* at ¶ 50; Dkt. No. 30-9 at 5.

On September 18, 2020, Plaintiff was working with Mr. Mix and Ms. Vicedomini when an incident occurred with a patron "who was known to cause problems in the past." Dkt. No. 28 at ¶ 107. The individual stated that he "was going to get a gun and return to shoot up the place." *Id.* Plaintiff followed the individual out of the building concerned that he might be retrieving a

gun.  *See id.*  The individual struck Plaintiff and "[a] confrontation followed outside," prompting Mr. Mix to intervene.  *See id.*  Mr. Mix eventually called the police to remove the individual from the premises.  *See id.*  Two days later, Defendant Kephart phoned Plaintiff and informed him that he had been suspended with pay in connection with the September 18 incident.  *See id.* at ¶ 108.  Neither Mr. Mix nor Ms. Vicedomini received a suspension.  *See id.* at ¶ 109.

On October 7, 2020, the parties participated in a PERB conference scheduled in response to Plaintiff's July PERB charge.  *See* Dkt. No. 28 at ¶ 111.  Just a few days later, on October 15, 2020, the County served Plaintiff with a notice of disciplinary charges based on the September 18 incident.  *See id.* at ¶ 51.  In pertinent part, the notice stated that Plaintiff "did not follow protocol in handling a client in your role as a Security Officer[.]"  Dkt. No. 25-14.  More specifically, the notice alleged that "[i]nstead allowing [sic] him to leave and avoiding any confrontation, you followed the client out the door, creating a conflict which was easily avoidable."  *Id.*  Plaintiff was alleged to have "pushed" the individual and to have failed to report the incident to a supervisor.  *Id.*  The notice also informed Plaintiff that the County intended to seek his termination and that he would be suspended for 30 days without pay.  *See id.*

On October 26, 2020, shortly after receiving the notice, Plaintiff filed an age discrimination complaint with the New York State Division of Human Rights ("SDHR").[1]  *See* Dkt. No. 28 at ¶ 55.  Plaintiff believed that Defendant Perine wanted him gone because he raised concerns about safety and because Defendant Perine wanted to hire his friend "Chip."[2]  *Id.* at ¶ 70.  Moreover, on some unspecified date during his employment, Mr. Mix told Plaintiff that

---

[1]  The Court notes that on April 9, 2021, Plaintiff administratively withdrew his SDHR/EEOC charge.  *See* Dkt. No. 28 at ¶ 63.

[2]  The record reflects that Defendant Perine is older than Plaintiff and is about the same age as "Chip."  Dkt. No. 28 at ¶ 71.

Defendants believe he was an "old timer" who was "set in his ways." *Id.* at ¶ 69.  Mr. Mix would attend security meetings, which Plaintiff was excluded from. *See id.* at ¶¶ 103-104.  Plaintiff believed Defendants "were trying to indoctrinate [Mr. Mix] on how they wanted him to respond to things with nothing written down." Dkt. No. 25-6 at 106.

On December 9, 2020, following the 30-day suspension, Defendant Kephart sent Plaintiff a letter directing him to return to work on December 12. *See* Dkt. No. 28 at ¶ 56.  Plaintiff had "assumed" that he was on administrative leave pending the disciplinary charges. *See id.*  Plaintiff was in Florida at the time. *See id.* at ¶ 57.  At some point, Plaintiff returned to New York in anticipation of going back to work. *See id.* at ¶ 120.  However, on or about December 11, 2020, Plaintiff injured his back while snow-blowing his mother's driveway. *See id.* at ¶ 59.  In connection with his back injury, Plaintiff applied for and later received disability leave with the County. *See id.* at ¶ 60.  Plaintiff never returned to active work and remained on disability leave at his full rate of pay for six months. *See id.* at ¶ 61.

As Plaintiff remained on leave following the snow-blower accident, the County Attorney's office initiated a fraud investigation. *See* Dkt. No. 28 at ¶ 67; Dkt. No. 25-12 at ¶ 27.  The investigation started after "a community member had reported seeing Plaintiff engaging in what appeared to be highly physical activities while on disability leave in the spring of 2021." Dkt. No. 25-12 at ¶ 29.  As a part of the investigation, Plaintiff was periodically under surveillance. *See* Dkt. No. 28 at ¶ 67; Dkt. No. 25-12 at ¶ 27.  Although Plaintiff did not lose any benefits as a result of the investigation, the surveillance caused him distress and concern with his neighbors, family, and friends. *See* Dkt. No. 28 at ¶ 68.

On July 7, 2021, the parties participated in an arbitration regarding Plaintiff's disciplinary charges before an independent arbitrator. *See* Dkt. No. 28 at ¶ 64.  Plaintiff was represented by

CSEA.  *See id.* at ¶ 65.  On August 23, 2021, the arbitrator issued an opinion and award finding

Plaintiff guilty of the charges.  *See id.* at ¶ 66.  The arbitrator upheld the 30-day suspension

finding Plaintiff guilty of the allegations in the October 2020 notice of discipline.  *See id.*; Dkt.

No. 25-16.  However, the arbitrator refused to uphold the proposed termination.  *See id.*

Specifically, the arbitrator reasoned that, "given [Plaintiff's] six years of service and only a prior

warning as discipline over similar misconduct, just cause would not support termination as the

appropriate discipline given the inherent principle of progressive discipline."  *Id.*

    After 12 months of leave, Plaintiff was separated from his employment because he could

not, and did not seek to, return to work.  *See* Dkt. No. 28 at ¶ 62.  The County served a

"Termination of Employment Letter" upon Plaintiff on February 24, 2022.  *Id.*  Plaintiff is no

longer employed and receives Social Security disability benefits in connection with his back

injury.  *See id.*

    Overall, Plaintiff alleges that Defendants took four unlawful adverse actions against him:

(1) the January 2019 counseling memorandum; (2) the May 2020 shift change; (3) the October

2020 notice of discipline; and (4) the Spring 2021 surveillance and fraud investigation during

Plaintiff's disability leave.  *See* Dkt. No. 1 at ¶¶ 15-41.  Plaintiff asserts a litany of theories as to

why he was discriminated and/or retaliated against, which the Court will address below.

### III. DISCUSSION

**A.    Standard of Review**

    A court may grant a motion for summary judgment only if it determines that there is no

genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994).  When analyzing a summary judgment motion, the court "cannot try

issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions on its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553-54 (2d Cir. 2005) (internal quotations omitted).  Nonetheless, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id.* (quoting *Anderson*, 477 U.S. at 252).  "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts', . . . and they may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.*

**B.   First Amendment Retaliation**

10

To establish a retaliation claim under Section 1983 in violation of a public employee's First Amendment rights, a plaintiff must show that: "(1) his or her speech was constitutionally protected; (2) he or she suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). In determining whether a plaintiff's speech was constitutionally protected, the court must determine "whether [he] spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation omitted). This requires two separate determinations: "(1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern." *Kelly v. Huntington Union Free Sch. Dist*, 675 F. Supp. 2d 283, 291 (E.D.N.Y. 2009) (citing *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009)). "If either of these requirements is not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law." *Id.*

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999). Speech relates to a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Griffin v. City of N.Y.*, 880 F. Supp. 2d 384, 401 (E.D.N.Y. 2012) (citation omitted).

As the Supreme Court has explained, conducting the inquiry into whether speech is made "as a citizen" has sometimes proved difficult because of the enormous variety of factual situations that may arise in such cases. *See Garcetti*, 547 U.S. at 418 (quotation omitted). The inquiry is a "practical one," for which the Supreme Court has not articulated a comprehensive framework to define whether speech is in the course of an employer's duties. *See id.* at 424. Indeed, because

the inquiry is fact-bound, courts sometimes defer resolution of this question because the record is not sufficiently developed or disputes of fact exist precluding resolution of this question as a matter of law.  *See e.g.*, *Smith v. N.Y.C. Dep't of Educ.*, No. 09-CV-9256, 2011 WL 5118797, *7 (S.D.N.Y. Oct. 28, 2011) (explaining that "[a]ny reliable conclusion would require evidence of precisely what was said and to whom it was communicated"); *Caraccilo v. Vil. of Seneca Falls*, 582 F. Supp. 2d 390, 407 (W.D.N.Y. 2008).  Nevertheless, the Second Circuit has recognized that the question of "[w]hether the employee spoke solely as an employee and not as a citizen is . . . largely a question of law for the court." *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011).  The law is clear that "when a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor . . . he or she is speaking as an employee and not as a citizen.[]  In such cases, the First Amendment does not protect the employee's speech from discipline or retaliation by the employer." *Weintraub v. Board of Educ. of the City of N.Y.*, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2007) (footnote omitted) (citing *Garcetti*, 547 U.S. at 418).

Defendants assert that Plaintiff's alleged "whistleblower" complaints concern his workplace grievance activities and concerns "about the security and safety measures or lack thereof in the main concourse/entrance and screening area of the DSS building."  Dkt. No. 25-17 at 7 (citation and internal quotations omitted).  Defendants state that "Plaintiff's speech was made through an existing dispute-resolution policy, outlined in a collective bargaining agreement between his employer and his union." *Id.*  They argue that "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens[,]" and thus not entitled to First Amendment protection. *Id.*  Notwithstanding, Defendants contend that "Plaintiff suffered no adverse employment action on account of his grievance" and that his termination occurred "over a year after his grievance" regarding conduct that was unrelated to his safety complaints. *Id.* at 8.

Similarly, Defendants assert that Plaintiff's "one-hour shift change in May of 2020" occurred "nine months" later, and was the result of the County's COVID-19 pandemic response, which included "a raft of other changes."  Dkt. No. 31 at 6-7.

In opposition, Plaintiff contends that "[a]lthough [his] speech eventually did take the form of an employee workplace violence grievance, [Plaintiff] did not complain about his own unsatisfactory working conditions, but rather continuously voiced workplace violence issues that jeopardized the public safety of employees and patrons at the DSS facility."  Dkt. No. 29 at 11. He contends that his shift change and disciplinary charges "were motivated by Defendants' unlawful retaliatory animus towards him for his public safety complaints[.]"  *Id.*  Furthermore, Plaintiff asserts that he "upgraded his workplace violence complaints by filing a PERB charge alleging, *inter alia*, that the County retaliated against him[.]"  *Id.* at 13.  Plaintiff argues that "a PERB charge fundamentally is public in nature and is constitutionally protected under the First Amendment."  *Id.* (citation omitted).

Herein, based on the undisputed record evidence, the Court finds that Plaintiff has failed to establish a First Amendment retaliation claim.  Plaintiff's reliance on temporal proximity (nine months as to the May 2020 shift change and one year as to the disciplinary charges) is simply too attenuated to support an inference of retaliatory animus without any direct evidence.  Aside from the issue of timing, Plaintiff offers no reasons or authorities suggesting that his complaints have a "relevant analogue to citizen speech," as is necessary for First Amendment protection. *Weintraub*, 593 F.3d at 204 (citing *Garcetti*, 547 U.S. at 423).  Rather, the undisputed record shows that Plaintiff's activities concerned his own daily working conditions and environment, which he voiced through incident reports and union grievances—means that are unavailable to the general public.  *See Agosto*, 982 F.3d at 95 (noting that "the 'forum in which a petition is lodged

will be relevant to the determination . . .' because a 'petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context'") (quoting *Borough of Duryea, Penn. v. Guarnieri*, 564 U.S. 379, 398 (2011)).  Even assuming the complaints touched on a matter of general importance to the public, Plaintiff's activities were principally focused on issues that were personal in nature.  *See Montero*, 890 F.3d at 399-400.

Furthermore, the Court notes that Plaintiff's July 2020 PERB charge was approximately three months prior to his October 2020 disciplinary charges.  But the Court need not address whether three months is sufficiently close in time in this case because the Second Circuit has ruled repeatedly that a PERB charge alleging retaliation "does not qualify for First Amendment protection[.]" *Agosto v. N.Y.C. Dept. of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020) (citing *Montero v. City of Yonkers*, 890 F.3d 386, 399-400 (2d Cir. 2018)).

Accordingly, Plaintiff's First Amendment retaliation claims must be dismissed.

## C.    FMLA Interference and Retaliation

FMLA entitles eligible employees to twelve workweeks per year of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of the employee." 29 U.S.C. § 2612(a)(1)(D).  While an employee is on FMLA leave it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA.  29 U.S.C. § 2615(a)(1).  At the end of the period of FMLA leave, the employee has the right to be restored to the position, or its equivalent, that he or she held prior to taking leave.  *See* 29 U.S.C. § 2614(a)(1)(A).  However, this right is not absolute.  "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the

FMLA leave period." 29 C.F.R. § 825.216(a).

The FMLA expressly creates a private cause of action for equitable relief and monetary damages against an employer who violates Section 2615. *See* 29 U.S.C. § 2617(a)(2); *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724-25 (2003). The Second Circuit recognizes two claims under the FMLA: (i) interference with FMLA rights; and (ii) retaliation for exercising FMLA rights. *See Potenza v. City of N.Y.*, 365 F.3d 165, 167-68 (2d Cir. 2004); *accord Voltaire v. Home Servs. Sys., Inc.*, 823 F. Supp. 2d 77, 90 (E.D.N.Y. 2011) ("The Second Circuit recognizes a distinction between claims which allege a violation of § 2615(a)(1)—so called 'interference' claims—and claims which allege violations of § 2615(a)(2) and (b), which are called 'retaliation' claims."); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 198-99 & n.30 (S.D.N.Y. 2009) (citing cases).

"To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziadio v. Culinary Instit. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016) (citing 29 U.S.C. § 2615(a)(1)). To state a *prima facie* claim for interference under the FMLA, a plaintiff must allege the following: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied that to which she was entitled under the FMLA." *Id.* On the other hand, "[t]o establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429 (citations and internal quotations omitted).

Defendants argue that the interference claim must be dismissed because there are "no allegations whatsoever that [Plaintiff] was ever denied FMLA benefits[.]" Dkt. No. 25-17 at 15. As to the retaliation claim, Defendants contend that Plaintiff "has suffered no adverse employment action and there is no evidence of a retaliatory intent." *Id.* at 16. Regarding the January 2019 counseling, Defendants assert that Plaintiff "admits" to the conduct alleged and "merely disputes that he should have been counseled." *Id.* As to the 2020 leave, Defendants assert that his shift changed "as part of the DSS building's COVID response." *Id.* Defendants contend that, "[i]n any event, on their face, neither his shift changes nor his counseling constitutes an adverse employment action." *Id.* at 17. Furthermore, Defendants assert that the October 2020 discipline "came a full 4 months after [Plaintiff] returned from a 3rd FMLA leave" and that there is no evidence "connecting this discipline to Plaintiff's FMLA leave." *Id.* Finally, as to Defendants' surveillance of Plaintiff during his final disability leave in Spring 2021, Defendants contend that Plaintiff suffered no resulting "harm," that he nonetheless "received the maximum amount of paid time allowed," and that "[t]here is no evidence that this surveillance was intended as a retaliatory measure for taking FMLA." *Id.* (citation omitted).

In opposition, Plaintiff argues that Defendant Perine "interfered with his FMLA leave request in early 2020 by not immediately approving it, and telling him he would have to approach his higher up supervisors to get approval." Dkt. No. 29 at 25. As to the retaliation claim, Plaintiff asserts that "following the approval of his medical leave [in December 2020], the County retained an investigator to follow [Plaintiff], but did not reach any conclusion or take any action based on this surveillance." *Id.* at 26. Plaintiff contends that "[t]he surveillance ordered by Defendants caused [him] emotional distress and raised concerns with neighbors, family and friends[.]" *Id.*

Here, the Court finds that the undisputed record evidence demonstrates that Plaintiff's

FMLA interference and retaliation claims must be dismissed.  The record shows that Defendants did not deny Plaintiff his FMLA rights.  Even if Defendant Perine initially declined to process Plaintiff's application, there is no dispute that it was ultimately approved just three hours later. Plaintiff offers no authorities suggesting that such conduct constitutes a violation of FMLA when coupled with an actual approval mere hours later.  In any event, it is undisputed that Plaintiff actually received FMLA leave each time he requested it and there is no evidence that Defendants failed to otherwise comply with their obligations or act responsively in providing such leave.  *Cf. Graziadio*, 817 F.3d at 424-29.

As to Plaintiff's FMLA retaliation claim, there is no record evidence causally connecting Plaintiff's exercise of FMLA rights with any adverse employment action.  In January 2019, Plaintiff received a counseling memorandum and additional training for two incidents that occurred shortly after his December 2018 FMLA leave.  *See* Dkt. No. 25-12 at ¶ 31; Dkt. No. 25-15.  As to the first incident, Plaintiff disputed that he was confrontational with the patron in the lobby, but admits that he told a County supervisor "I can't believe I got to take this shit for 23 bucks an hour." Dkt. No. 25-6 at 35.  According to Plaintiff, the supervisor "ran right to [Defendant Perine]" to complain.  *Id.*  As to the second incident, Plaintiff did not dispute the allegations, but contend that he did nothing wrong.  *See id.* at 36-39.  After carefully reviewing the undisputed record evidence and taking the parties' specific contentions into consideration, the Court finds that the counseling memorandum and additional training do not constitute an adverse actions under the circumstances.  The record shows that Plaintiff was paid for the additional training, and he admits that he did not receive discipline over the incidents.  *See id.* at 39-40.  In viewing the record as a whole, the conduct alleged simply does not rise to the level of that which would dissuade a reasonable person from taking FMLA leave.

Overwhelmingly, Plaintiff's FMLA retaliation claim concerns his return from leave in spring 2020, which paralleled the initial outbreak of the COVID-19 pandemic.  Defendants have articulated a legitimate, non-retaliatory explanation insofar as Plaintiff's shift change was a part of a larger restructuring of the DSS security team in light of COVID-19, which altered the responsibilities of entry into the building.  There is no record evidence suggesting that Defendants' explanation is pretextual.  Plaintiff merely offers his own conclusory disagreement with the restructuring plan, which he contends "made even less logical sense."  Dkt. No. 28 at ¶¶ 43-44.  But there is nothing in the record showing that the restructuring was anything other than a legitimate operational plan brought about by the COVID-19 pandemic.  The Court finds that no reasonable juror would believe that Defendants restructured their entire DSS building security plan to retaliate against Plaintiff for taking FMLA leave.[3]

Accordingly, Plaintiff's FMLA interference and retaliation claims must be dismissed.

**D.     ADA Disability Discrimination**

The Americans with Disabilities Act ("ADA") prohibits "discrimination against a qualified individual on the basis of disability in regard to job application procedure, the hiring, advancement, or discharges of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*[.]" *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (citing *McDonnell Douglas Corp. v.*

---

[3] As to the alleged surveillance, the record shows that Plaintiff was on long-term disability leave beginning in December 2020, not FMLA leave.  *See* Dkt. No. 28 at ¶¶ 59-61.  Accordingly, Plaintiff's claims concerning allegedly unlawful surveillance are best analyzed in the context of his disability discrimination claim, as discussed *infra*.

*Green*, 411 U.S. 792, 802 (1973); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.

2006)).  In light of that familiar framework, a *prima facie* of discrimination under the ADA

requires that the plaintiff demonstrate that "(1) his employer is subject to the ADA; (2) [he] is

disabled within the meaning of the ADA; (3) [he] is otherwise qualified to perform the essential

functions of the [his] job with or without accommodation; and (4) [he] suffered an adverse

employment action because of [his] disability." *Harvin v. Manhattan & Bronx Surface Transit

Operating Auth.*, 767 Fed. Appx. 123, 127 (2d Cir. 2019) (citing *Jacques v. DiMarzio, Inc.*, 386

F.3d 192, 198 (2d Cir. 2004)).

Defendants assert that "[t]he fraud investigation began at the direction of the County

Attorney's office after a community member reported seeing Plaintiff engaging in what appeared

to be highly physical activities while on disability leave." Dkt. No. 25-17.  Notwithstanding,

Defendants argue that there was no adverse action taken in connection with the surveillance as

Defendants "never terminated Plaintiff's medical leave status and he received the maximum

amount of paid time allowed by County policy." Dkt. No. 31 at 9.

Plaintiff argues that "[e]ven after he was approved by SSDI for disability benefits,

Defendants continued to retaliate against him by surveilling him and his personal residence[.]"

Dkt. No. 29 at 26.  Plaintiff asserts that even after his independent medical examination

confirmed his disability, "the Tompkins County Sheriff's Department requested that he attend an

interview alleging he defrauded the county." *Id.*  Plaintiff contends that the surveillance caused

him "emotional distress and raised concerns with his neighbors, family, and friends[.]" *Id.*

Herein, Plaintiff's disability discrimination claim is unsupported by the undisputed record

evidence.  Plaintiff does not assert a failure-to-accommodate or failure to hire and/or promote

claim under the ADA.  Rather, Plaintiff's claim is that he was targeted and/or treated less

favorably due his disability.  It is undisputed that Defendants (or the County Attorney) hired a private investigator to conduct surveillance on Plaintiff in spring 2021 while he was out on long-term disability leave.  *See* Dkt. No. 28 at ¶ 67.  Plaintiff offers no evidence showing that he was treated differently than other employees out on disability leave.  Plaintiff merely asserts that he was discriminated against solely on the undisputed fact that he was under surveillance.  But the record shows that Defendants had received a complaint about Plaintiff from a community member indicating that he might have been malingering.  *See* Dkt. No. 25-12 at ¶ 29.  As such, Defendants investigated Plaintiff's disability claim because they believed that he was not disabled.  Placing Plaintiff under surveillance after receiving a complaint from a community member does not rise to the level of an adverse employment action and such surveillance was not instituted "because of" Plaintiff's disability.  *See Jones v. Bush*, 160 F. Supp. 3d 325, 345 (D.D.C. 2016) (holding that placing the plaintiff under surveillance did not amount to an adverse employment action).  Even assuming that such surveillance amounts to an adverse employment action, Plaintiff offers no record evidence to suggest that this explanation is pretextual.  In fact, in his deposition, Plaintiff acknowledges that the timing of his claimed disability was "shady," further supporting Defendants' legitimate, non-discriminatory reason for hiring a private investigator.  *See* Dkt. No. 25-6 at 129 ("The time of it looks like 'Oh, this is shady.'  But it's just the way it played out, you know").  Moreover, Plaintiff does not allege any facts suggesting that the surveillance was done in an aggressive or hostile manner.  Rather, Plaintiff testified that the private investigator observed him from a distance while Plaintiff engaged in his activities of daily living.  *See* Dkt. No. 25-6 at 128-31.  Such surreptitious surveillance does not support Plaintiff's conclusory assertion that the private investigator was hired to harass him and his family.  Instead, it supports Defendants' contention that the private investigator was hired as part of an investigation by the

County Attorney into the validity of Plaintiff's claimed disability.  As such, Plaintiff has failed to present evidence sufficient for a reasonable factfinder to conclude that Defendants' stated reasons for hiring a private investigator were pretextual.

Accordingly, Plaintiff's ADA disability discrimination claim must be dismissed.

## E.    ADEA Age Discrimination

Under the ADEA, for persons over the age of 40, employers cannot "discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. §§ 623(a)(1), 631(a).  "To prevail on an ADEA age discrimination claim, it is not sufficient for a plaintiff to show 'that age was simply a motivating factor' in the employer's adverse action."  *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 302-303 (2d Cir. 2021) (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009)).  Instead, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Id.* at 303.

The burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to claims for ADEA violations.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010)).  Under this three-step framework, the plaintiff has the initial burden to establish a *prima facie* case of discrimination by showing that he or she: (1) was in the protected age group of forty years or older; (2) was qualified for the position at-issue; (3) suffered an adverse employment action; and (4) that the identified adverse action occurred under circumstances giving rise to an inference of discrimination.  *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 194-95 (2d Cir. 2007) (citing *Terry*, 336 F.3d at 137-38).

Defendants argue that Plaintiff has failed to show a *prima facie* case of discrimination

and, in any event, he has failed to show that age was the "but-for cause" of any adverse action. Dkt. No. 25-17 at 11.  Defendants argue that the "old timer" comment is insufficient to raise an inference of discriminatory motive because it was not made repeatedly or by a supervisor, and otherwise has no causal link with any employment action.  *Id.* at 13.  Furthermore, Defendants argue that Plaintiff testified that he believed Defendant Perine tried to "force him out[] so that he could hire [his] friend 'Chip[,]'" who is the same age as Defendant Perine and thus older than Plaintiff.  *Id.*  Defendants also assert that Plaintiff was undisputedly excluded from security meetings because he was not involved in "administrative matters" and "had no reason to be there."  Dkt. No. 31 at 9.

Plaintiff argues that "[t]here is both direct and circumstantial evidence regarding age discrimination in the record."  Dkt. No. 29 at 23.  Plaintiff contends that "the record evidence shows that [he] was excluded or not invited by [Defendant] Perine and other supervisors to workplace security meetings[.]"  *Id.*  Plaintiff asserts that his colleague Mr. Mix told him that "the supervisors considered him an 'old timer' and would not change his views."  *Id.*  Plaintiff asserts that "[h]e was brought up on disciplinary charges and given a counseling memo despite his younger coworkers not being disciplined for similar conduct in dealing with similar violent patrons at the DSS facility."  *Id.*

Herein, the Court finds that Plaintiff has failed to establish an age discrimination claim under the ADEA.  The undisputed record evidence shows that age was not the but-for factor relative to any alleged adverse employment action.  To the extent Plaintiff was excluded from meetings while Mr. Mix was not, it is undisputed that Mr. Mix was taking on additional duties, including administrative matters.  *See* Dkt. No. 28 at ¶ 45.  Furthermore, there is no evidence that Ms. Vicedomini ever attended these meetings, which further undercuts Plaintiff's claim that he

was excluded because of his age.  *See* Dkt. No. 25-6 at 106.  Insofar as Mr. Mix told Plaintiff that

Defendants believed he was an "old timer" who was "set in his ways," the record here shows that

such stray comment by a non-supervisory employee is insufficient to rise to the level of age

discrimination.  *See Lively*, 6 F.4th at 306.  The undisputed evidence demonstrates that Plaintiff's

age was not the but-for factor leading to any alleged adverse employment action.

        As such, Plaintiff's ADEA age discrimination claim must be dismissed.

## F.      Title VII Gender-Based Retaliation

        Title VII contains an anti-retaliation provision making it unlawful "for an employer to

discriminate against any of his employees . . . because [the employer] has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

this subchapter."  42 U.S.C. § 2000e-3(a).  The plaintiff must establish a *prima facie* showing of

(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3)

an adverse employment action; and (4) a causal connection between the protected activity and the

adverse employment action.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citations

omitted).  In a retaliation claim, an adverse employment action is one that is "materially adverse

to a reasonable employee[.]"  *Id.* at 165.  "Actions are 'materially adverse' if they are 'harmful to

the point that they could well dissuade a reasonable worker from making or supporting a charge

of discrimination.'"  *Id.* (quoting *White*, 548 U.S. 53, 57 (2006)).  Importantly, "[w]here timing is

the only basis for a claim of retaliation, and gradual adverse job actions began well before the

plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

        Defendants assert that the alleged gender discrimination complaint occurred on

July 24, 2019, but that Plaintiff's shift did not change "until 10 months later in May of 2020," and

that "he was not disciplined until another five months after that, in October of 2020." Dkt. No. 25-17 at 19.  Defendants argue that "[a]side from the mere fact that one event followed the other in time, there is no evidence of a relationship between Plaintiff's alleged reporting of inappropriate conduct and his subsequent employment actions." *Id.* at 19-20.

In response, Plaintiff asserts that, after the July 2019 complaints, "[Defendant] Perine took every opportunity to retaliate against [Plaintiff] when he had the opportunity to do so." Dkt. No. 29 at 27.  Plaintiff contends that Defendant Perine "orchestrated the shift change lobby restructure memo in May 2020, which caused [Plaintiff] to have to spend more time at work and economic loss" in connection with his second job.  *Id.*

Herein, the Court finds that Plaintiff has failed to establish a Title VII retaliation claim. There is no record evidence of direct retaliatory animus causally connected to Plaintiff's complaints.  As discussed previously, to the extent Plaintiff claims that Defendants implemented the lobby restructuring plan solely in retaliation, the Court finds that no reasonable juror could believe as much.  Likewise, to the extent Plaintiff contends that his October 2020 discipline was causally connected to his July 2019 complaint, such a claim is far too attenuated.  *See Jordan v. United Health Group Incorporated*, 783 Fed. Appx. 31, 34 (2d Cir. 2019) (affirming denial of Title VII retaliation claim and noting that "the temporal nexus here—over one year—is too attenuated to establish such a connection") (collecting cases).  There is simply no record evidence supporting Plaintiff's allegations.

Accordingly, Plaintiff's Title VII retaliation claim must be dismissed.

## G.    New York State Law Claims

Federal courts may exercise supplemental jurisdiction over "claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or

controversy." 28 U.S.C. § 1367. "A district court's decision whether to exercise . . . jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). Supplemental jurisdiction may be declined if

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Finally, a court should weigh "the values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise supplemental jurisdiction over state-law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Until recently, Plaintiff's NYSHRL discrimination and retaliation claims would have been analyzed in the same manner as their Title VII and ADEA counterparts; however, in 2019, the New York State legislature amended the law so that the standards are now broader than similar protections under federal law. *See* N.Y. Exec. L. § 300; *Green v. General Motors*, No. 20-cv-1797, 2023 WL 3541265, *8 (N.D.N.Y. May 18, 2023) ("So after the 2019 amendments to the NYSHRL, the dismissal of [the plaintiff's] Title VII claim might not necessarily defeat her NYSHRL claim"). But because Plaintiff's federal claims have been dismissed for the reasons stated above, the Court declines to exercise supplemental jurisdiction over Plaintiff's Section 75-b and NYSHRL claims.

Accordingly, Plaintiff's Section 75-b and NYSHRL claims are dismissed.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

25

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 25) is **GRANTED**; and the Court further

**ORDERS** that the complaint (Dkt. No. 1) is **DISMISSED** with prejudice; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order upon all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 11, 2023
      Albany, New York

```
Mae A. D'Agostino
U.S. District Judge
```